UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 21-cr-449 (TSC)** |
| v. | : | |
| | : | |
| TONY LEE GILL, | : | |
| | : | |
| Defendant | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Tony Gill to two months' incarceration and six months supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution and a fine the Court deems appropriate.

I.      **Introduction**

Defendant Tony Gill, 53, is a former marine and a financial analyst with Crothall Healthcare. Gill participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

Gill pleaded guilty to violating 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by (1) the defendant's decision to travel and join the ongoing riot later in the afternoon on January 6, 2021 after observing the riot on various news media; (2) the defendant's actions on the Lower West Terrace where the defendant joined other rioters for over twenty minutes before climbing into the Capitol through a mezzanine window adjacent to the Inauguration Tunnel Entrance; and (3) the defendant's decision to remain on Capitol grounds near a police line when he exited the Capitol around 5:00 p.m. after police reinforcements arrived and began forcibly removing rioters from the Capitol. The defendant continued to observe and document the chaotic scene around him.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Gill's crime support a sentence of two months incarceration in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid an unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol in the Statement of Offense. (ECF 19)

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Gill's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Tony Lee Gill traveled from his residence in Front Royal, Virginia to a hospital in Washington D.C. as part of his employment. After traveling to Washington D.C. for work, Gill learned about the ongoing riot at the United States Capitol. Gill drove to the Capitol and parked his vehicle near 500 New Jersey Avenue NW at around 4:17 p.m. He parked roughly 0.7 miles from the Capitol. Prior to his arrival at the U.S. Capitol, Gill was generally aware of what was occurring at the U.S. Capitol on January 6, 2021, including the fact that the Vice President was temporarily visiting the U.S. Capitol that day.

After parking his car, Gill walked to the Capitol along New Jersey Ave. N.W., eventually arriving at the intersection of New Jersey Ave. N.W. and Constitution Ave. N.W. at 4:25 p.m. This intersection is adjacent to the north side of the Capitol.

Gill then entered the restricted area of the Capitol, walking along the north and northwest side of the Capitol to the Capitol's West Plaza to join the ongoing riot. (*Image 1*) After arriving at the West Plaza, Gill moved deeper into the crowd, eventually climbing stairs leading to the Lower West Terrace. Gill arrived at the Lower West Terrace at approximately 4:34 p.m. (*Image 2*)



*Image 1: Gill within the restricted perimeter of the United States Capitol.*

3



*Image 2: CCTV footage of Gill entering the Lower West Terrace.*

Gill remained with the mob on the Lower West Terrace for approximately 20 minutes, slowly making his way through the crowd toward a broken mezzanine window near the Inauguration Tunnel Entrance ("Tunnel"). (*Image 3*) Rioters had shattered this window at approximately 4:30 p.m. to enter the Capitol interior. Here, Gill recorded and took photos of the ongoing riot around him. As Gill approached the broken window and Tunnel, he chanted with other rioters, encouraging the ongoing riot. (*Image 4*)



*Image 3: Screenshot of Gill among the mob on the Lower West Terrace.*



*Image 4: Screenshot of Gill engaging with the mob near the Tunnel.*

Just before 5 p.m., Gill reached the broken window adjacent to the Tunnel, where some of the most intense fighting occurred on January 6, 2021. Despite observing the fighting, he climbed through the window and into the Capitol interior with the assistance of other rioters. (*Image 5 and 6*)



*Image 5: Screenshot of Gill climbing into the Capitol through a broken window.*

5



*Image 6: Screenshot of Gill climbing into the Capitol through a broken window.*

After Gill climbed through the window, Gill entered a room inside the Capitol. In this room, other rioters in Gill's vicinity destroyed property and used this property to try to move further into the Capitol interior. Gill remained inside this room with these rioters. (*Image 7*)



*Image 7: Gill inside the Capitol.*

After Gill entered the Capitol, additional officers arrived at the Tunnel and on the west side of the Capitol. At approximately 5:04 p.m., these reinforcements began deploying flashbangs and tear gas to disperse the mob near the Tunnel and Lower West Terrace. At this point, Gill left the Capitol interior through the broken window and traveled to the Capitol's West Plaza, where he

continued to loiter among the mob, recording and photographing the chaotic scene around him. (*Image 8*)



*Image 8: Gill recording and photographing the riot on the West Plaza after departing the Capitol interior.*

During this time, Gill also stood with other rioters in front of a police line on the West Plaza, where rioters heckled and assaulted law enforcement while Gill was present. (*Image 9*)



*Image 9: Screenshot of Gill near a police line on the West Plaza after leaving the Capitol.*

After retreating to the West Plaza, Gill departed Capitol grounds along the north and northwest side of the Capitol at approximately 5:23 p.m. The following day, Gill drafted a message

on his phone referencing his actions the day before where he stated, "Domestic Terrorist, how about American loving patriot? Hey snowflakes, we're fighting for you too." Gill also drafted a note on his phone shortly after the 2020 election stating, "If Trump don't win, The World will go to Hell!"

*Gill's Post-arrest Interview with the FBI*

On December 12, 2023, Gill gave a voluntary post-arrest interview to the FBI. During the interview, Gill admitted to traveling to Washington D.C.

Gill advised the FBI he traveled to Washington D.C. for a work visit on January 6th, 2021. However, Gill do not travel to his workplace. According to Gill, after he entered Washington, D.C. Gill observed traffic near Capitol Street and conducted a Google search to see what was occurring at the Capitol. Thereafter, Gill learned of the ongoing riot.

Gill described being "mesmerized" by all the people near the Capitol. He observed other rioters running toward the Capitol wearing tactical vests and knew these individuals were not the FBI. Gill advised that based on this commotion, he parked several blocks from the Capitol where he walked and joined the crowd outside the Capitol. Gill recalled observing the "craziest scene he had ever seen." Gill told the FBI he observed people "chanting, yelling, screaming, and climbing on scaffolding." Gill also observed people throwing bottles and saw people climb through windows. He told the FBI he observed people trying to enter the Capitol through the normal entrances even though they were not allowed.

Gill acknowledged entering the Capitol though a window. According to Gill, he was caught up in the moment. He heard another rioter calling for "strong guys and big guys to come up to the window." Gill described climbing through a window and entering a small office with approximately twenty other people. Gill heard another rioter in this office call for rioters to knock

down a door and rioters prepared to breach this door with furniture. Gill then advised the FBI he

exited through the same window that he initially entered.

*The Charges and Plea Agreement*

On December 21, 2023, the United States charged Gill by a four-count Information with

violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 11,

2024, pursuant to a plea agreement, Gill pleaded guilty to Count One of the Information, charging

him with violating 18 U.S.C. § 1752(a)(1). By the plea agreement, Gill agreed to pay $500 in

restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Gill now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea

agreement and the U.S. Probation Office, Gill faces up to twelve months of imprisonment and a

fine of up to $100,000. Gill must also pay restitution under the terms of his plea agreement. *See*

18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at

49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR also contained in the plea agreement.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[2] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 39-46.

The government objects to the application of U.S.S.G. § 4C1.1 as set forth in the PSR. *See* PSR at ¶¶ 47. Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case because the defendant's conduct constituted a credible threat of violence. As Judge Howell noted in *United States v. Andrulonis*, evaluating whether a defendant's actions posed a credible threat of violence "requires examination of all the factors of the offense including, what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions." No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12. The Court should therefore examine Gill's conduct on January 6 within the context of the violence taking place around him at the Tunnel and Lower West Plaza, and the fact that "this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction." *Id.*

---

[2] The PSR incorrectly references U.S.S.G. §2B2.3(b)(1)(A)(vi) as the specific offense characteristic, which applies to Arlington National cemetery or a cemetery under the under the control of the National Cemetery Administration. PSR ¶ at 40. Because the trespass occurred "at any restricted building or grounds" the appropriate provision is U.S.S.G. §2B2.3(b)(1)(A)(vii).

Specifically, after Gill arrived at the Capitol, he traveled to the Lower West Terrace, where he remained for over 20 minutes. Here Gill slowly made his way toward the Tunnel, where he observed and cheered on some of the most violent assaults that occurred at the Capitol on January 6, 2021. Gill did not leave despite observing the chaotic scene around him, and instead chose to join other rioters on the Lower West Terrace and inside the Capitol. After arriving at a broken mezzanine window adjacent to the Tunnel, Gill utilized the assistance of other rioters to scale the Capitol exterior and climb through a broken window into the Capitol interior. These actions contributed to the ongoing melee on the Lower West Terrace and could have reasonably encouraged others in the mob who observed Gill climb through the window to engage in similar reckless conduct.

After Gill left the Capitol interior, instead of leaving Capitol grounds and avoiding further dangerous situations, he traveled back to the Lower West Plaza and purposefully moved directly in front of a police line, as other rioters in Gill's immediate vicinity assaulted the officers in that line. While Gill did not assault law enforcement, the situation on the West Front at approximately 5:00 p.m. was increasingly volatile as officers, including recently arrived reinforcements, attempted to remove the rioters from Capitol grounds. Gill's presence only contributed to that volatility. In this vein, Gill positioned himself with other rioters who were a credible threat to law enforcement. Thus, Gill's actions in this context would have been reasonably perceived by those officers—some of whom had been fighting with violent rioters for four hours at this point—as posing a credible threat of violence. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6  (defining a "credible threat of force" under § 4C1.1 as "a believable expression of an intention to use physical force to inflict harm."). *See also United States v. Tyng Jing Yang,* 2024 U.S. Dist. LEXIS 22938 ("credible" threat is one that "offer[s]

reasonable grounds for being believed or trusted." Credible, Merriam Webster, https://www.merriam-webster.com/dictionary/credible; *United States v. Bauer*, Crim. A. No. 21-3862-2 (TNM), 2024 U.S. Dist. LEXIS 14897, 2024 WL 324234, (D.D.C. Jan. 29, 2024) ("[A] 'credible threat of violence' is a believable expression of an intention to use physical force to inflict harm.")

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated Gill's criminal history as a category I. PSR at ¶ 51. Accordingly, the U.S. Probation Office calculated Gill's total adjusted offense level, after acceptance and application of U.S.S.G. § 4C1.1, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 95.

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### V.       Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three months' incarceration and six months of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Gill's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Gill, the absence of violent or destructive acts is not a mitigating factor. Had Gill engaged in such conduct, he would have faced additional criminal charges.

Gill's case presents three important aggravating factors the Court should consider when crafting an appropriate sentencing.

First, Gill knew what was occurring at the Capitol and chose to join the riot before he arrived. This is not a case where Gill was "swept up in the crowd" in the colloquial sense after traveling with the mob from the former president speech – naively believing he was simply following the crowd into the Capitol. While the government rejects such characterizations, and has repeatedly done so in the January 6, 2021, context, Gill's actions are different. Gill learned of the riot at the Capitol after-the-fact. Gill did not attend the former president's speech, nor was he present near the Ellipse or along the National Mall as the crowd moved to the Capitol. He researched what was occurring after the riot started. Once the riot began, Gill made the intentional decision to adjust his plans and drive toward the Capitol. He wanted to join the riot and arrived on Capitol grounds over three hours after rioters began to overtake the Capitol. Gill knew exactly what he was doing – he wanted to join the mob.

Second, Gill's actions at the Capitol are troublesome. Gill immediately traveled to the Lower West Terrace where he engaged with the mob as he approached the Tunnel. He watched the ensuing violence and chaos and chanted with other rioters. Gill moved through the crowd, eventually arriving at a mezzanine window adjacent to the Tunnel entrance. Here, with the assistance of another rioter, Gill scaled the exterior of the Capitol and climbed through the broken window to the Capitol interior. He remained inside with other rioters who were destroying property and trying to use that destroyed property to move deeper into the Capitol. Gill only left the building after police reinforcements arrived and began clearing the Lower West Terrace.

Lastly, once the police reinforcement arrived, Gill remained on Capitol grounds. He exited the Capitol through the same broken mezzanine window that he entered. He traveled to the West

Front where he appeared with rioters who were assaulting officers along a police line, knowing that he had no authority to do so. He used his phone to document the continuing chaos around him as officers tried to clear the Capitol of all rioters.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Gill's History and Characteristics

As set forth in the PSR, Gill's criminal history score is 0. *See* PSR ¶ 51. Gill reported to the PSR writer that he enlisted in the U.S. Marine Corps in 1990 and was honorably discharged in 1995. Gill worked as an area operations manager for Loomis Fargo and Company from 1995 to 2002. Gill has been employed by Crothall Healthcare based in Wayne, Pennsylvania since October of 2002, working his way up to a regional vice-president position until a recent demotion to a financial analyst. Gill has been compliant with his conditions of pre-trial release.

While Gill's military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, Gill understood right from wrong. He is keenly familiar with rules and appropriate conduct as it pertains to restricted government facilities. He knew that joining a mob and climbing through a broken window at the Capitol was unlawful. His voluntary decision to storm a guarded government building is disturbing in light of his former military service and training. His repeated assertions that he was simply "mesmerized" and just tried to see what was going on at the Capitol is not credible. Gill joined the mob, actively participated with other rioters, and took actions he knew were unlawful. The events of January 6, 2021, occurred because of the sheer number of people working to storm the Capitol. Gill was one of those individuals and, in this case, Gill's conduct and former military service demonstrates a true need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Gill cannot plead ignorance for his actions on January 6, 2021. He cannot argue he traveled to the Capitol three hours after the riot initially started as an innocent bystander simply interested in observing the events at the Capitol. Gill researched the ongoing riot and immediately adjusted his plans to join the mob. Gill had every opportunity to continue with his day and return to his home in Front Royal, Virginia. He did not. He changed his plans and traveled directly to the Capitol knowing there was on ongoing riot. At the Capitol, he directly went to the action on the Lower West Terrace. Here, he actively participated in the riot as he chanted with rioters and engaged in other disorderly conduct.

For the reasons routinely discussed in this memorandum, Gill made the conscious decision to support the mob's actions. The messages the FBI uncovered on Gill's phone from the day after January 6, 2021, further support this contention and refute Gill's naivety. Gill referred to himself as a self-described "American loving patriot" and referred to those who objected to the mob's actions at the Capitol as "snowflakes." Gill stated that when he went to the Capitol he was, "Fighting for you too." Gill's motives for going to the Capitol were abundantly clear – he did so to support the former president and what he believed would occur if the former president was not reelected, suggesting that "the world will go to hell." The Court must sentence Gill in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Gill based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Gill has pleaded guilty to Count One of the Information, charging him with entering or remaining on a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court has sentenced numerous Capitol breach defendants on 18 U.S.C. § 1752(a)(1) convictions alone to terms of incarceration. Gill's entry into the Capitol through a broken window on the Lower West Terrace leading to an office space, places Gill in a more serious category of offenders than defendants who entered the Capitol, albeit unlawfully, through an open entryway and remained in hallways or central, more public spaces, such as the Rotunda. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. Dennis Adams* (23-cr-396), this Court sentenced Adams to 45 days of incarceration after Adams entered the Capitol through a broken window near the Senate Wing Door. While Adams' entry through the broken window was his second entry into the Capitol after entering through a fire door moments earlier, Gill presence on the Lower West Terrace for nearly 20 minutes watching violence unfold before he climbed *up and over* a broken window offers similar aggravation the Court should consider. Like Adams' removal from the Capitol, the circumstances and location of Gill's presence on the Capitol – on the Lower West Terrace where some of the most violent assault against law enforcement occurred – demonstrate both Adams and Gill entered the Capitol despite knowing they had no authority to do so.

Additionally, Adams and Gill have other similarities; both Adams and Gill witnessed violence directed at police; both remained on Capitol grounds for at least an hour; and both Adams and Gill remained on Capitol grounds as police tried to clear the Capitol. Gill only left the building after police reinforcements arrived to support the vastly outnumbered law enforcement. In other words, he did not leave once he realized what other rioters were doing inside the building. And after he left the building, Gill did not leave Capitol grounds. He stayed and retreated to the West Front where he engaged with officers on a police line and remained on Capitol grounds filming the chaotic scene.

This Court has sentenced other rioters to incarceration on an 18 U.S.C. § 1752(a)(1) conviction after they entered the Capitol through a broken window in *United States v. Michael Dillon (23-cr-108)* – 45 days*; United States v. Elliot Bishai* (21-cr-282) – 14 days; and *United States. v. Elias Irizarry* – 14 days. Dillon and Gill's cases are similar in several respects: Dillon

entered the Capitol through a window near the Senate Wing Door. Dillon and Gill also spent considerable time observing the raucous scene outside the Capitol before making the decision to enter. Bashai and Irizarry also entered the Capitol through a shattered window near the Senate Wing Door. While these defendant's conduct was troublesome and unauthorized, unlike Gill, Adams, Dillon, Bashai, and Irizarry entered the Capitol through an easily accessible waist high shattered window directly adjacent to a point of ingress where rioters were flooding into the Capitol - the Senate Wing Door. To the contrary, Gill slowly made his way across the Lower West Terrace where he scouted a mezzanine window adjacent to the Tunnel and used the assistance of other rioters to scale the Capitol exterior and enter through this broken window.

Lastly, this Court has sentenced other defendants to periods of incarceration on an 18 U.S.C. § 1752(a)(1) conviction with aggravating factors similar to Gill in *United States v. Jeffrey Finley* (21-cr-526) – 75 days; and *United States v. Michael McCormick* (21-cr-710) – 14 days; Finley, like Gill, remained on Capitol grounds despite observing officers' attempts to repel the crowd using riot control techniques and pepper spray.[5] McCormick and Gill each approached the Capitol later in the afternoon despite observing the heavy police presence and other indications of a riot. McCormick and Gill knew of the unfolding crisis and made the conscious decision to be a part of it after-the-fact. McCormick spent approximately eight minutes in the Capitol, and, remained on Capitol grounds for some time after exiting the Capitol despite observing and recording police crowd control efforts to remove rioters. Gill did the same but did so after participating in the riot, witnessing violent assaults on law enforcement, and climbing through a

---

[5] The Government acknowledges that Finley took additional aggravating measures to obstruct the government's investigation when he deleted social media and photographs and videos of himself and others at the Capitol.

broken window where he joined rioters in the Capitol interior who were destroying property and using this property to gain access deeper into the Capitol.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gill must pay $500 in restitution, which reflects in part the role Gill played in the riot on January 6.[7] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2024." *Id.* Gill's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 115.

## VI.   Fine

The defendant's convictions for violations of 18 U.S.C. § 1752(a)(1) subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $500 to $9,500. U.S.S.G. § 5E1.2(c).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the Defendant to two months' incarceration and six months supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution and a fine the Court deems appropriate. Such a sentence promotes respect for the law, and deters future crime by imposing restrictions on Gill's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Eli J. Ross*
Eli Ross
Assistant United States Attorney
Bar No. IL 6321411
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 297-1515
Email: Eli.Ross@usdoj.gov